# In the United States Court of Federal Claims

**FOR PUBLICATION**

No. 25-2075C
(Filed: August 17, 2026[*])

**CHUGACH LOGISTICS AND FACILITY SERVICES JV, LLC**,

*Plaintiff*,

v.

**UNITED STATES**,

*Defendant*,

and

**CCS KING GEORGE 2 LLC**,

*Defendant-Intervenor*.

*Aron C. Beezley*, Bradley Arant Boult Cummings LLP, Washington, DC, for plaintiff. With him on the briefs were *Nathaniel J. Greeson* and *Gabrielle A. Sprio* (argued), Bradley Arant Boult Cummings LLP, Washington, DC.

*Russell J. Upton* (argued), Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, for defendant. With him on the briefs were *Brett A. Shumate*, Assistant Attorney General; and *Patricia M. McCarthy*, Director, and *Douglas K. Mickle*, Acting Deputy Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC. *Erin L. Hernandez*, Senior Associate Counsel, and *Andrew Campos*, Associate Counsel, Naval Facilities Engineering Systems Command Southwest, U.S. Department of the Navy, San Diego, CA, Of Counsel.

[*] This decision was filed under seal in accordance with the protective order entered in this case on August 10, 2026. On August 17, 2026, the parties filed a joint notice confirming no proposed redactions.

*Roger V. Abbott* (argued), Miles & Stockbridge PC, Washington, DC, for defendant-intervenor. With him on the briefs were *Stephen P. Ramaley*, *Mitchell D. Dolman*, and *Samara A. Rahman*, Miles & Stockbridge PC, Washington, DC.

**OPINION AND ORDER**

***BONILLA, Judge***.

This post-award bid protest involves a nearly $100 million United States Navy Base Operations Support Contract (BOSC). Plaintiff Chugach Logistics and Facility Services JV, LLC (Chugach) contests the award of the BOSC to defendant-intervenor CCS King George 2, LLC (CCS KG). Among the procurement issues raised, Chugach argues the Navy improperly: (1) credited CCS KG with non-prime corporate experience, (2) failed to consider the experience of CCS KG's protégé member, (3) ignored CCS KG's known negative past performance on a predecessor contract, (4) neglected to conduct a price risk analysis, and (5) made a flawed best-value determination. Chugach seeks permanent injunctive relief canceling the contract award to CCS KG and directing the Navy to reevaluate the proposals.

Pending before the Court are the parties' cross-motions for judgment on the administrative record. The Court heard oral argument on July 31, 2026. For the reasons below, plaintiff's dispositive motion is granted-in-part and denied-in-part, and, conversely, defendant's and defendant-intervenor's dispositive cross-motions are denied-in-part and granted-in-part.

**BACKGROUND**

Headquartered in San Diego, California, the Naval Facilities Engineering Systems Command Southwest (NAVFAC-SW) is one of ten naval facilities engineering commands. Serving nineteen military installations across six states (Arizona, California, Colorado, Nevada, New Mexico, and Utah), NAVFAC-SW "oversees a wide range of critical services, including public works, planning, engineering and design, construction, real estate management, environmental services, and the acquisition and disposal of facilities and real estate."[1] To perform this mission, NAVFAC-SW employs over 3,500 service members and civil servants.

On August 30, 2024, NAVFAC-SW issued a solicitation seeking proposals for a consolidated BOSC for Naval Base Coronado, California. The stated purpose for the eight-year, firm-fixed price, indefinite delivery, indefinite quantity contract was to "provide various customers at [Naval Base Coronado] with a single responsive, efficient, and reliable means of obtaining integrated base operations support

[1] *See About Us*, NAVFAC SW., *available at* https://perma.cc/U988-MAAN.

services."[2] AR 3.[3] The statement of work consolidated twelve requirements from preexisting naval service contracts and five new requirements. The aggregated list includes: custodial services, portable toilet rentals, photovoltaic maintenance, exhaust vent cleaning, pool and chemical maintenance, grease trap pumping services, grounds maintenance, bulk pumping, biomedical waste, integrated solid waste management, personal protective equipment, vertical transportation equipment, auto lift maintenance, boat washing maintenance, pavement clearance, biomedical cleaning, and "Hood Ansul Suppression System" certification.[4] AR 4–5. Of note, custodial services is the largest component of the procurement, accounting for nearly half of the total annual contract value.

The procurement employed a best-value source selection process balancing price against five evaluative factors: Corporate Experience (Factor 1), Past Performance (Factor 2), Key Personnel (Factor 3), Quality Management System (Factor 4), and Safety (Factor 5). For all factors save Past Performance, proposals were assigned a combined technical/risk adjectival rating ranging from "unacceptable" to "outstanding."[5] For Past Performance, proposals were assigned a performance confidence assessment adjectival rating ranging from "no confidence" to "substantial confidence."[6] As to the relative weight afforded each factor, the solicitation instructed that the four technical factors (Corporate Experience, Key Personnel, Quality Management System, and Safety) "[we]re of equal importance to each other and, when combined, [we]re equal in importance to [Past Performance]." AR 271. The combination of the five non-price factors, in turn, was "significantly more important than price." *Id.*

Under Corporate Experience (Factor 1), the solicitation required offerors to provide between two and four examples of "recent, relevant projects that aggregately demonstrate[d] [the offeror's] experience as a prime contractor." AR 256. To be considered recent, the project must have been ongoing (for at least one year) or completed within five years of the August 30, 2024 solicitation release date. To qualify as relevant, a project was required to have a total annual contract value of at least $10 million and encompass work in at least two of three maintenance and

---

[2] The maximum performance period was broken down into a six-month base period followed by seven one-year option periods and one six-month option period.

[3] "AR __" is a citation to a Bates-numbered page in the administrative record.

[4] "Hood Ansul Suppression System" likely refers to a type of fire suppression system manufactured by ANSUL, a company specializing in fire suppression systems and solutions across different industries. *See Why We Do What We Do*, ANSUL, *available at* https://perma.cc/KQ3K-MM29. The Court was unable to determine which specific system is referenced in the solicitation using publicly available information.

[5] The complete range of combined technical/risk adjectival ratings included: outstanding, good, acceptable, marginal, and unacceptable.

[6] The complete range of performance confidence assessment adjectival ratings included: substantial confidence, satisfactory confidence, neutral confidence, limited confidence, and no confidence.

service areas: facility investment, custodial, and other (training pools).[7] The solicitation defined "prime contractor" experience to "include[] the prime experience of any partnerships, joint ventures, teaming arrangements (e.g., first-tier small business subcontractor), or corporate affiliates (subsidiary, sister subsidiary, sister company, or parent company)." AR 256 (parentheticals cleaned up). The solicitation also contemplated bifurcated levels of credited experience requirements: partnerships, joint ventures, and teaming arrangements had no additional submission requirements beyond the standard project narratives; corporate affiliates (subsidiaries, sister subsidiaries, sister companies, and parent companies), however, were required to submit a narrative and organizational chart explaining "the corporate relationship of the affiliates." AR 257.

For Past Performance (Factor 2), the solicitation instructed offerors to submit Contractor Performance Assessment Reporting System (CPARS) evaluations and Past Performance Questionnaires (PPQ) for all projects submitted under Corporate Experience (Factor 1).[8] The solicitation emphasized that "[w]hile the Government may elect to consider data from other sources, the burden of providing detailed, current, accurate, and complete past performance information rests with the Offeror." AR 260. Relying on the submitted information and "consider[ing] the recency and relevance of the information, the source of the information, context of the data, and general trends in the Offeror's performance," the Navy would then consider how well the offeror performed the projects from the Corporate Experience (Factor 1) section of the proposal. *Id.* The evaluation criteria for Factor 2 further provided, in a section titled "Past Performance on All CPARS Evaluations for Services":

> The Government may review all CPARS evaluations for Offerors, for projects other than those submitted under Factor 1, with specific focus on quality, schedule and management. CPARS evaluations that contain ratings for marginal to unsatisfactory for quality, schedule, and/or management may lower the overall confidence assessment rating. For offerors submitting as any type of teaming arrangement, when reviewing all CPARS evaluations the Government will review all available CPARS evaluations for the Offeror as a whole as well as any entities within the teaming arrangement.

AR 260–61.

The solicitation stated that price proposals would be evaluated for fairness and reasonableness. Definitionally, this meant the Navy would "identify any pricing that

[7] "Other (training pools)" included services such as "[c]hemical replenishment, water testing, pool light operations, seasonal startups, filtration maintenance, service calls, vacuuming, swimming pool operator maintenance and operations of training pools." AR 257.

[8] Where an interim or final CPARS was submitted for a project, the Navy would review only the CPARS evaluation and not the PPQ(s) for that project.

is unreasonably high," cautioning that such pricing could result in disqualification. AR 255–56. When discussing the evaluation of price and potential disqualification, the solicitation consistently described the analysis to be performed as focused on "unreasonably high/inconsistently priced proposal[s]."[9] While the solicitation did not explicitly mention a price risk analysis, it did incorporate by reference Defense Federal Acquisition Regulation Supplement (DFARS) provision 252.204-7024 (Notice on the Use of the Supplier Performance Risk System), AR 232, which defines "price risk" as "a measure of whether a proposed price for a product or service is consistent with historical prices paid for that item or service" and instructs the contracting officer to "consider [Supplier Performance Risk System (SPRS)] risk assessments during the evaluation of . . . offers received in response to th[e] solicitation . . . ." 48 C.F.R. § 252.204-7024(a), (c)(2).[10]

In response to the BOSC solicitation, the Navy received four proposals ahead of the October 10, 2024 submission deadline, including from Chugach and CCS KG. Chugach is a Small Business Administration (SBA)-certified 8(a) mentor-protégé joint venture (MPJV) comprised of mentor Wolf Creek Federal Services, Inc. (Wolf Creek) and protégé Chugach Solutions Enterprise, LLC (Chugach Solutions).[11] Both Wolf Creek and Chugach Solutions are subsidiaries of Chugach Government Solutions, LLC.[12] Headquartered in Anchorage, Alaska, Chugach Government Solutions is itself a subsidiary of Chugach Alaska Corporation and describes itself as

[9] *See, e.g.*, AR 255 ("As analysis is performed to determine a fair and reasonable price, the Government will seek to identify any pricing that is unreasonably high. . . . Pricing may be considered unreasonably high when . . . the price of one or more prices . . . is significantly overstated. An offer may be rejected if the proposed price is unreasonably high . . . ."); AR 256 ("[I]f unique and innovative approaches are the basis for an apparently unreasonably high/inconsistently priced proposal, the nature of these approaches and their impact on price must be completely documented."); *id.* ("A price that is found unreasonably high in relation to the proposed work may be indicative of an inherent lack of understanding of the solicitation requirements and may result in the overall proposal not being considered for award.").

[10] In a bid protest before the Government Accountability Office (GAO), the Source Selection Evaluation Board (SSEB) chairperson admitted that, although the solicitation incorporated the DFARS provision by reference, he "did not use the SPRS tool during the evaluation of proposals . . . ." AR 6475. In the same proceedings, the Navy presented uncontested evidence that the SPRS contained no usable assessments for CCS KG or Chugach.

[11] Under the SBA's mentor-protégé program, an approved firm may serve as a mentor to a protégé firm "to provide business development assistance" and "improve the protégé firms' ability to successfully compete for federal contracts." 13 C.F.R. § 125.9(a). Under this program, a mentor and a protégé may form a joint venture. *Id.* § 125.9(d). To be eligible for an 8(a) small business set-aside, however, the MPJV—if it "exists as a formal separate legal entity" from its comprising members—must either be unstaffed or consist solely of members who would individually be eligible for the contract. *Id.* § 121.103(h)(1)(i)–(ii). Additionally, the 8(a) protégé member must perform at least 40% of the work, meaning the mentor member can perform up to 60% of the work. *Id.* § 124.513(d).

[12] *See Subsidiary Companies*, CHUGACH GOV'T SOLS., *available at* https://perma.cc/GA7B-M949.

delivering solutions ranging "[f]rom logistics and facilities to IT, engineering, and operational support."[13]

CCS KG is also an SBA-certified 8(a) MPJV, comprised of mentor King & George LLC (King & George) and protégé Cascade Contracting & Services (Cascade). Headquartered in Fort Worth, Texas, with satellite offices in four other states and Washington, DC,

> King & George provides general contracting [and] construction management, facilities [operations and maintenance], vehicles [and] equipment maintenance, call centers, and environmental services . . . [supporting a] wide array of commercial and government clients, including federal agencies such as the [U.S. Army Corps of Engineers], U.S. Air Force, [U.S.] Navy, the [Federal Aviation Administration], and the National Oceanic Atmospheric Administration (NOAA).

*About Us*, King & George, *available at* https://perma.cc/57HZ-U6TK. Cascade describes itself "as an SBA-certified 8(a) firm . . . wholly owned by a non-profit Native Hawaiian Organization," headquartered in Aiea, Hawaii, with offices in Washington, Nevada, and Texas.[14]

After an initial evaluation in November 2024, "the SSEB determined that discussions [we]re desirable and recommend[ed] entering discussions with all four (4) Offerors . . . ." AR 3533. Following discussions in early 2025 and submissions of final proposal revisions, the SSEB presented its final evaluation results to the Source Selection Authority (SSA) in a May 6, 2025 report. Relevant here, the SSEB assigned CCS KG and Chugach the following adjectival technical ratings:

| Offeror | Factor 1: Corporate Experience | Factor 3: Key Personnel | Factor 4: Quality Management System | Factor 5: Safety | Overall Technical Rating |
|---|---|---|---|---|---|
| **CCS KG** | **Outstanding** | **Good** | **Outstanding** | **Outstanding** | **Outstanding** |
| **Chugach** | **Outstanding** | **Outstanding** | **Outstanding** | **Outstanding** | **Outstanding** |

AR 3532–33.[15] For Past Performance (Factor 2), the SSEB assigned CCS KG an adjectival rating of substantial confidence, whereas Chugach received a rating of satisfactory confidence. And Chugach's evaluated price of $107,240,818.63, while relatively close to the prices proposed by the two offerors not discussed herein and

[13] *See Newsroom*, CHUGACH GOV'T SOLS., *available at* https://perma.cc/7TT6-JFUY.

[14] *See About Us*, CASCADE CONTRACTING & SERVS., *available at* https://perma.cc/ZN99-TV2B.

[15] The SSEB awarded a third proposal significantly lower technical adjectival ratings. The fourth proposal was eliminated from further consideration.

in line with the Independent Government Cost Estimate (IGCE), was the highest proposed price. Indeed, Chugach's proposed price was approximately thirty percent higher than CCS KG's proposed price of $82,444,251.27.

The SSEB found that "CCS KG had the strongest overall technical proposal with both the highest possible overall technical rating and the highest possible performance confidence assessment rating." AR 3533. Noting that both CCS KG and Chugach received the highest overall technical rating of outstanding,[16] the SSEB highlighted the delta in the weighted past performance confidence assessment ratings between CCS KG (substantial confidence) and Chugach (satisfactory confidence). The SSEB further stressed that CCS KG's proposal offered the lowest price. Weighing these considerations, the SSEB concluded that "CCS KG provide[d] the greatest value to the Government for technical, past performance, and price. As such, an award to CCS KG [wa]s in the best interest of the Government from a price and technical (non-price) standpoint." AR 3534. Based on these findings, in a final report dated May 6, 2025, the SSEB recommended awarding the contract to CCS KG. Three days later, the Source Selection Advisory Council concurred. In a Source Selection Decision Document dated May 20, 2025, the SSA formally selected CCS KG for the BOSC award.

In its winning proposal, CCS KG submitted four projects under Corporate Experience (Factor 1): two awarded to KJS MP Joint Venture, LLC (an MPJV consisting of King & George as protégé and J&J Worldwide Services as mentor); one awarded to KGJJ Engineering Solutions, LLC (another MPJV consisting of King & George as protégé and J&J Worldwide Services as mentor); and one awarded to AKG Services, LLC (a joint venture consisting of King & George as managing member and Ameritac, Inc.). For each of these projects, CCS KG listed the above joint ventures and members thereof next to "Name of Firm that Performed the Work" on the pre-printed form and checked the box marked "Prime Contractor." AR 2882, 2890, 2898, 2906. CCS KG then checked the boxes marked "Subsidiary" and "Parent Company" under the following subheading: "If the firm who performed this project differs from the Offeror submitting a proposal under this solicitation, identify the relationship to the Offeror below . . . ."[17] *Id.* CCS KG then detailed King & George's membership in each of the named entities and specified its prominent role in project work under the amended subheading: "If this project was performed by Offeror key personnel, identify the name of the individual, name of firm they worked for, and describe their involvement on this project . . . ." *Id.*

Rating these projects, Navy evaluators documented which legal entity performed the work on each project and identified the relationship between the

[16] Although Chugach received a higher adjectival rating for Key Personnel (Factor 3) and three more technical factor strengths than CCS KG, both proposals netted the same overall technical rating.

[17] The BOSC Corporate Experience (Factor 1) pre-printed form did not include a box for any type of joint venture.

performing entity and CCS KG. Evaluating the first submitted project, for example, Navy evaluators noted: "Project was performed by: KJS MP Joint Venture, LLC (a Mentor-Protégé JV between Member King [&] George, Protégé and J&J Worldwide Services, Mentor)," further finding that King & George "performed the work as the prime contractor." AR 3476. Navy evaluators made similar findings regarding the other three submitted projects. *See* AR 3477–79; *accord* AR 3480 ("The Offeror is a MPJV. Of the four (4) relevant projects, all were performed by the JV Mentor: King [&] George LLC.").[18] In assigning CCS KG an outstanding rating for Corporate Experience (Factor 1), the SSEB credited the MPJV with demonstrating corporate "experience without relying on corporate affiliates (e.g., subsidiaries, sister subsidiaries, sister companies, and parent companies)." AR 3481.

For Past Performance (Factor 2), the SSEB considered the same four projects identified by CCS KG under Corporate Experience (Factor 1) and, based on "[t]he submitted past performance evaluations," assigned a rating of substantial confidence. AR 3494. Notably absent from the SSEB's assessment, however, is any mention of King & George's performance of a recent predecessor janitorial services contract at Naval Base Coronado for which King & George received a marginal rating for quality. The history of that contract and the details of King & George's performance thereunder are murky. It is unclear, for instance, when and why King & George's performance under the contract ended. The Court was unable to verify Chugach's claim that King & George's poor performance prompted the government to prematurely terminate the contract and re-award essentially the same contract to Chugach. That said, a public database indicates both that the King & George contract ended without the government exercising all available options and that Chugach began performing a similar contract at the same location the next day.[19] At oral argument, counsel for CCS KG declined to endorse Chugach's characterization of events and pointed out that the same public database indicates that the government made some payments to King & George under the contract as recently as April 2026, long after the contract's apparent end date and alleged re-award to Chugach.[20] Government counsel declined to weigh in on the matter. Despite this confusion, one thing is clear: King & George received a marginal rating for quality on the predecessor Naval Base Coronado janitorial services contract.

---

[18] For clarity, the referenced "Offeror" denotes the MPJV comprised of mentor King & George and protégé Cascade.

[19] *Compare* Contract Summary for Contract No. N6247321F5388, USASPENDING.GOV, available at https://perma.cc/C2JV-PLGC (listing end date of March 31, 2024, for King & George's janitorial services contract), *with* Contract Summary for Contract No. N6247324C1613, USASPENDING.GOV, available at https://perma.cc/72GQ-GAFK (listing start date of Apr. 1, 2024, for Chugach's janitorial services contract).

[20] *See* Contract Summary for Contract No. N6247321F5388, *supra* note 19 (showing a "funding . . . action" of $19,078 for King & George's contract on April 9, 2026; indicating funding was for "O[ption] Y[ear] 1").

CCS KG did not submit the janitorial services contract as one of its Corporate Experience (Factor 1) projects and did not submit the corresponding CPARS under Past Performance (Factor 2). The four-year janitorial services contract valued at nearly $22.3 million yielded an annual value of roughly $5.6 million. Because (1) the annual value did not meet the solicitation's $10 million threshold and (2) the scope of work was limited to just one applicable service area (custodial services) rather than the BOSC solicitation's minimum of two, this contract did not meet the definition of "relevant project" included in Corporate Experience (Factor 1). AR 256–57.[21]

Of note, the assessing official who signed the CPARS for Kiing & George's janitorial services contract on October 17, 2023, was one of three SSEB members for the BOSC procurement at issue. *Compare* AR 6473 (CPARS), *with* AR 3470 (SSEB Report). Justifying the marginal rating, the assessing official explained:

> Clients continue to . . . identify[] the lack in custodial services. Services are not performed within the contract[] . . . Schedule (daily services, weekly service, monthly and annual services). Custodians are not completing the services per the contract[']s Performance standards. The Contractor management team has identified the custodians who have not provided services to the contract and have been working with the union to replace the custodians or implement corrective actions to ensure the custodians improve performance. The Government has recognized the Contractor[']s willingness to ensure performance is met by their management approach and scheduling controls[,] which have been implemented, however, performance has improved since the base year of the contract[,] and less negative evaluations . . . have been submitted. The Contractor[] is provided a rating of Marginal in this field as there is still room for improvement.

---

[21] In post-award litigation before the GAO, the Navy insisted that it did not rely solely on information submitted by the offerors and had, in fact, conducted a search for additional CPARS evaluations. More specifically, the SSA declared:

> I went to the CPARS database to pull CPARS history for all offerors and their mentor partners, as applicable, using the criteria of: assessments dating back 5 years before the solicitation issuance date, Business Sector: Facilities Services, and NAICS: 561210; the results of this search yielded no history of derogatory (less than satisfactory) past performance. I went to the Government's own ieFacman contracts database[] and pulled a list of NAVFAC Base Operations Support Contract by Purpose: BOS – Base Operating Support. I reviewed the list of Base Operations Support Contracts for all offerors, affiliates, mentor partners, and mentor partners performing in other joint ventures.

AR 6488–89. The due diligence performed, according to the Navy, did not unearth the CPARS for the predecessor janitorial services contract; nor could it have since the search was limited to CPARS under NAICS code 561210 and contracts with a listed purpose of "BOS – Base Operating Support." AR 6489. The janitorial services contract, by contrast, lists an NAICS code of 561720. AR 6469.

AR 6471.[22] Yet the assessing official included the following recommendation at the end of the CPARS: "Given what I know today about the contractor's ability to perform in accordance with this contract or order's most significant requirements, I **would** recommend them for similar requirements in the future." AR 6473 (bold reflecting the fill-in-the-blank entry on the preprinted form).

Chugach, in turn, submitted three projects for the Corporate Experience (Factor 1) component of its proposal: two performed by Wolf Creek (Chugach's mentor partner) and a third performed by Defense Base Services, Inc. (a sister company of Chugach). As noted by the Navy evaluators, "[Chugach] provided the one-page narrative and organization chart required when affiliate companies are used to demonstrate experience." AR 3484. Finding all projects submitted by Chugach recent and relevant, the Navy assigned Chugach an outstanding rating for Corporate Experience (Factor 1). AR 3482.

Addressing Past Performance (Factor 2), the SSEB considered only two of the three projects Chugach submitted under Corporate Experience (Factor 1). The Navy excluded the project performed by Defense Base Services, Inc., citing Chugach's "fail[ure] to submit a correct CPARS report for the project." AR 3495 ("This CPARS is not associated with the project admitted in Factor 1." (alteration to capitalization)). Based on the CPARS for the other two projects, the SSEB assigned Chugach a Past Performance (Factor 2) rating of satisfactory confidence, meaning "the Government ha[d] a reasonable expectation that the Offeror w[ould] successfully perform the required effort." AR 3494–95.

After awarding the BOSC to CCS KG on May 20, 2025, the Navy notified Chugach and the other offerors of their non-selection. Following a requested post-award debrief, Chugach filed a bid protest with the GAO, challenging the Navy's evaluation of proposals under Corporate Experience (Factor 1) and Past Performance (Factor 2) as well as the Navy's price evaluation and resulting best-value determination. On November 20, 2025, the GAO denied the protest on all grounds. Chugach filed this action on December 8, 2025.

## DISCUSSION

### I. Standard of Review

When reviewing a federal agency's procurement decision, this Court employs the Administrative Procedure Act (APA) standard to determine whether the challenged action was arbitrary, capricious, an abuse of discretion, or otherwise contrary to law. 28 U.S.C. § 1491(b)(4) (citing 5 U.S.C. § 706). "The arbitrary and capricious standard is highly deferential and requires this Court to sustain an agency action evincing rational reasoning and consideration of relevant factors." *Clean Team*

[22] King & George received satisfactory ratings for schedule, management, and regulatory compliance.

*Janitorial Serv., Inc. v. United States*, 171 Fed. Cl. 1, 8 (2024) (first citing *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000); and then citing *CHE Consulting, Inc. v. United States*, 552 F.3d 1351, 1354 (Fed. Cir. 2008)). An agency's procurement decision is arbitrary and capricious "if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (citations omitted); *accord Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009).

With respect to challenges brought under the first ground, the Court must "determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis." *Centech*, 554 F.3d at 1037 (quoting *Impresa*, 238 F.3d at 1332–33). A decision lacks a rational basis, and is therefore arbitrary and capricious, where the agency "entirely failed to consider an important aspect of the problem . . . ." *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (applying this standard in the bid-protest context). As for the second ground, "the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations." *Centech*, 554 F.3d at 1037 (quoting *Impresa*, 238 F.3d at 1333). Procurement officials "are given broad discretion" in their procurement duties; when a procurement officer makes a reasonable decision within the scope of that discretion, "a court may not substitute its judgment for that of the agency." *DynCorp Int'l, LLC v. United States*, 10 F.4th 1300, 1311 (Fed. Cir. 2021) (quoting *R & W Flammann GmbH v. United States*, 339 F.3d 1320, 1322 (Fed. Cir. 2003)). While the scope of review under this standard is narrow and a court is not to substitute its judgment for that of the agency, the agency must nonetheless "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).

The "evaluation of past performance is a matter within the discretion of the contracting agency[,] and . . . the 'agency's reasonable interpretation of the facts is entitled to considerable deference.'" *Taahut v. United States*, 849 F. App'x 260, 266 (Fed. Cir. 2021) (quoting *Glenn Def. Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901, 910 (Fed. Cir. 2013)); *accord CW Gov't Travel, Inc. v. United States*, 154 Fed. Cl. 721, 748 (2021) (collecting cases). Similarly, "technical ratings . . . involve discretionary determinations of procurement officials that a court will not second guess." *Allicent Tech., LLC v. United States*, 166 Fed. Cl. 77, 118 (2023) (quoting *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996)). Therefore, a protester "bears a heavy burden" to overcome the presumption of regularity that courts afford to an agency decision. *Impresa*, 238 F.3d at 1338. In a best-value tradeoff analysis, an agency's exercise of discretion is entitled to additional

deference, and "the agency's consideration" of the relative merits of competing proposals will not be disturbed absent a showing that the tradeoff analysis was irrational or arbitrary. *AM Gen., LLC v. United States*, 115 Fed. Cl. 653, 700 (2014).

The "focal point" for judicial review of a procurement decision is "the administrative record already in existence" at the time the agency acted. *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1379 (Fed. Cir. 2009) (quoting *Camp v. Pitts*, 411 U.S. 138, 142 (1973) (per curiam)). This principle places a direct documentation obligation on procuring agencies: "Where an agency fails to document or retain evaluation materials, it bears the risk that there may not be adequate supporting rationale in the record for [the Court] to conclude that the agency had a reasonable basis for its evaluation conclusions." *Mgmt. & Training Corp. v. United States*, 161 Fed. Cl. 578, 597 (2022) (additional citations omitted) (quoting *Trident Vantage Sys., LLC*, B-415944 et al., 2018 CPD ¶ 166 (Comp. Gen. May 1, 2018)). Post hoc rationalizations advanced by an agency—whether in litigation briefs, declarations, or debriefing materials—cannot provide the reasoned explanation the agency was required to provide at the time of the challenged decision. *See DynCorp Int'l*, 10 F.4th at 1316 ("[A]n agency cannot rely on a new rationale for an old decision."); *IAP Worldwide Servs., Inc. v. United States*, 159 Fed. Cl. 265, 286 (2022) ("[T]he Court will not put words in an agency's mouth or invent supporting rationales the agency has not itself articulated in the administrative record; *post hoc* explanations for agency decisions ordinarily will be rejected."); *e.g.*, *Sys. Stud. & Simulation, Inc. v. United States*, 152 Fed. Cl. 20, 32 (2020) (declining to credit SSA declaration submitted during litigation as a "post hoc rationalization created in the heat of litigation" (cleaned up)), *aff'd*, 22 F.4th 994 (Fed. Cir. 2021). A post hoc rationale is "any rationale that departs from the rationale provided at the time the procuring agency made its decision." *Sys. Stud.*, 152 Fed. Cl. at 32 (quoting *Raytheon Co. v. United States*, 121 Fed. Cl. 135, 158 (2015), *aff'd*, 809 F.3d 590 (Fed. Cir. 2015)). That said, where the agency's "path may reasonably be discerned" from the contemporaneous record—even if the documented reasoning is not of "ideal clarity"—the Court will sustain the decision. *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285–86 (1974) (first citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947); and then citing *Colo. Interstate Gas Co. v. Fed. Power Comm'n*, 324 U.S. 581, 595 (1945)).

Lastly, to prevail in a bid protest, a protester must do more than identify some error in the procurement process. The identified error must be significant and prejudicial. *WellPoint Mil. Care Corp. v. United States*, 953 F.3d 1373, 1377 (Fed. Cir. 2020) (quoting *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999)); *see also* 5 U.S.C. § 706 ("[D]ue account shall be taken of the rule of prejudicial error."). To establish prejudice, the protester must demonstrate that "there was a 'substantial chance' it would have received the contract award but for the [agency's] errors." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1353 (Fed. Cir. 2005). This test is more lenient than showing actual causation, but the protestor must do more than show a "mere possibility" that, but for the agency errors, it "would

have received the contract." *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996); *accord AM Gen., LLC*, 115 Fed. Cl. at 702.

II. Corporate Experience

A. Prime Contractor Experience

Chugach challenges the Navy's evaluation of CCS KG's Corporate Experience (Factor 1). The solicitation required offerors to submit between two and four reference projects demonstrating their "experience as a prime contractor." AR 256. The parties agree that, for an entity competing as a joint venture, the prime contractor experience of one member of the joint venture (e.g., King & George) can be credited as prime contractor experience of the joint venture (e.g., CCS KG). Chugach charges, however, that CCS KG failed to submit any qualifying reference projects. In support, Chugach relies on the fact that the four reference contracts submitted by CCS KG were awarded to neither King & George nor Cascade; the first two were awarded to KJS MP Joint Venture, LLC, the third to KGJJ Engineering Solutions, LLC, and the fourth to AKG Services, LLC. Acknowledging that King & George was a member of each awardee,[23] Chugach maintains that the sole "prime contractor" on each contract was the joint venture that held the contract—not the joint venture's members. On this premise, Chugach argues it was impermissible for the Navy to credit King & George and, in turn, CCS KG, with "prime contractor" experience for the reference contracts. This argument, if correct, would disqualify CCS KG for failure to submit any qualifying reference projects. But it relies on a narrow, literal interpretation of "prime contractor" that is unsupported by the solicitation.

When interpretating terms in a solicitation, the Court "must consider the [s]olicitation as a whole and interpret 'it in a manner that harmonizes and gives reasonable meaning to all of its provisions.'" *Safeguard Base Operations, LLC v. United States*, 989 F.3d 1326, 1344 (Fed. Cir. 2021) (quoting *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1353 (Fed. Cir. 2004)). Again, the solicitation here required offerors to provide examples of "recent, relevant projects that aggregately demonstrate[d] [their] experience as . . . prime contractor[s]" performing services similar in size, scope, and complexity to the base operations support work solicited. AR 256. It clarified that eligible experience "include[d] the prime experience of any partnerships, joint ventures, teaming arrangements (e.g. first-tier small business subcontractor, or corporate affiliates . . . [).]" *Id.*

The term "prime contractor" is typically understood in contrast to the term "subcontractor." Federal Acquisition Regulation (FAR) Part 3, for example, defines the terms as follows:

[23] KJS MP Joint Venture, LLC, and KGJJ Engineering Solutions, LLC, were MPJVs. AKG Services, LLC, was an ordinary joint venture.

> *Prime Contractor,* means a person who has entered into a prime contract with the United States.
>
> . . .
>
> *Subcontractor*—
>
> > (1) Means any person, other than the prime contractor, who offers to furnish or furnishes any supplies, materials, equipment, or services of any kind under a prime contract or a subcontract entered into in connection with such prime contract; and
> >
> > (2) Includes any person who offers to furnish or furnishes general supplies to the prime contractor or a higher tier subcontractor.

48 C.F.R. § 3.502-1. The solicitation consistently adopted this general prime-sub distinction. *See, e.g.*, AR 258 ("The Government will evaluate . . . relevant corporate experience *and depth of relevant corporate experience as a prime contractor* directly responsible to the customer, *its management of multiple subcontractors*, and how it coordinated with multiple stakeholders." (emphasis added)); AR 482 (Exhibit B form, offering three checkboxes for who performed the work on a project submitted under Factor 1: (1) "prime contractor," (2) "subcontractor," and (3) "first-tier small business subcontractor"). In context, it is clear that by requiring examples of prime contractor experience, the Navy intended to distinguish between prime and subcontractor experience.

Joint ventures—particularly MPJVs—and their members do not fit neatly into the prime-sub binary. *See, e.g.*, *Golden IT, LLC v. United States*, 165 Fed. Cl. 676, 689 n.9 (2023) ("[Plaintiff], as a[n] [MPJV], was not required by law or by the terms of the [Request for Quote] to identify its role as a subcontractor or prime contractor. *Nor could it have done so.*" (emphasis added)). A joint venture may hold a prime contract while the work thereunder is managed and completed by one or more of its members. The members generally act not as subcontractors but as the constituents that make up the prime contractor, interfacing directly with the government. Therefore, under the solicitation at issue, a joint venture's prime experience is creditable not just to the joint venture as a whole, but also to its members. This more inclusive reading of the solicitation gives effect to its use of both "prime contractor" and "joint venture," where "prime contractor" distinguishes prime-level contract performance from subcontractor-level performance, and the reference to "the prime experience of . . . joint ventures," AR 145, permits the agency to look within the joint venture structure to evaluate the member(s) that actually managed performance under the contract. Chugach's proffered interpretation, in contrast, is unworkable, particularly with regard to MPJVs, which are prototypically unpopulated and

consequently lack independent qualifying experience.[24, 25] *See supra* note 11 (discussing 13 C.F.R. § 121.103(h)(1)(i)–(ii)).

Moreover, the Navy clearly understood the relevant corporate relationships and the roles played by the joint venture members. The SSEB recognized that CCS KG is an MPJV composed of King & George and Cascade. It further documented that the reference projects submitted by CCS KG under Corporate Experience (Factor 1) were awarded to and performed by KJS MP Joint Venture, LLC, KGJJ Engineering Solutions, LLC, and AKG Services, LLC, while highlighting the specific role King & George played in each project. The SSEB did not overlook the fact that the submitted projects were performed by joint ventures other than CCS KG or gloss over King & George's specific role in each; rather, the SSEB evaluated the projects with that structure in mind.[26]

In sum, the Court concludes the Navy properly credited CCS KG with King & George's corporate experience gained through prior joint venture contract performances. The solicitation permitted assigning credit for prime contractor experience gained through joint ventures; the record shows King & George performed qualifying work through those joint ventures; and the SSEB accurately documented the corporate relationships between CCS KG, King & George, Cascade, and the joint

---

[24] Chugach's reading would lead to absurd results, particularly in the context of unstaffed joint ventures, where SBA regulations require designating a managing member "responsible for controlling the day-to-day management and administration of the contractual performance of the joint venture . . . ." 13 C.F.R. § 125.8(b)(2)(ii)(A)). The unstaffed joint venture could be credited with prime contractor experience even if it performed no work, had no meaningful interaction with the government, and played no role in project management—all while the member(s) that actually gained the experience would be categorically excluded from the agency's evaluation.

[25] Chugach's reliance on this Court's decision in *Noblis MSD, LLC v. United States* for the broad proposition "that federal contracting is built on the general principle of privity: one government, one contract, one contractor," 180 Fed. Cl. 667, 702 (2026), is misplaced. *Noblis* addressed reliance on affiliates and subcontractors in past performance evaluations, *see id.*, not whether an offeror's actual experience as a member of a joint venture can serve as prime contractor experience under a solicitation that expressly permits credit for joint venture prime experience. Rather than broadly holding that agencies could never credit offerors with the experience of subcontractors or affiliates, the Court concluded that "the past performance of affiliates and subcontractors is not the offeror's past performance per se," noting that "agencies have significant discretion in structuring their solicitations to define when and how they will consider the past performance and experience of team members — whether subcontractors or affiliates." *Id.* at 697 (emphasis omitted). The general distinction between offerors, affiliates, and subcontractors in *Noblis* thus does not answer the more-precise, solicitation-specific question presented here.

[26] Chugach's suggestion that the SSEB improperly credited CCS KG with unrelated corporate affiliate experience is misplaced. As detailed *supra*, even though CCS KG checked several boxes marked "Prime Contractor," "Subsidiary," and "Parent Company" on the BOSC Corporate Experience (Factor 1) form, *see* AR 2882, 2890, 2898, 2906, the detailed narratives surrounding and stemming from that exercise by CCS KG and the SSEB—coupled with the fact that the form did not include a joint venture or MPJV box—make clear that the submitted projects were not offered or considered as the experience of a parent, subsidiary, sister company, or other corporate affiliate.

venture entities nominally awarded the reference contracts submitted under Corporate Experience (Factor 1). Chugach fails to demonstrate otherwise.

B. Mentor v. Protégé Experience

Chugach further charges the Navy ran afoul of the solicitation and applicable SBA regulations by examining the experience of only CCS KG's mentor member (King & George) and failing to consider the lack of experience of its protégé member (Cascade). When the BOSC solicitation first issued on August 30, 2024, 13 C.F.R. § 125.8(e) provided:

> When evaluating the capabilities, past performance, experience, business systems and certifications of an entity submitting an offer for a contract set aside or reserved for small business as a joint venture established pursuant to this section, *a procuring activity must consider work done and qualifications held individually by each partner to the joint venture* as well as any work done by the joint venture itself previously. A procuring activity may not require the protégé firm to individually meet the same evaluation or responsibility criteria as that required of other offerors generally. The partners to the joint venture in the aggregate must demonstrate the past performance, experience, business systems and certifications necessary to perform the contract.

13 C.F.R. § 125.8(e) (Oct. 11, 2023) (emphasis added). Section 125.8(e) was amended on January 16, 2025, to add the following subsection:

> *A procuring activity has discretion whether to require a protégé or lead small business member of a joint venture to demonstrate some level of past performance and/or experience. It may rely solely on the past performance and experience of the mentor* or non-similarly situated joint venture partner, or it may require some level of past performance and/or experience of the protégé or lead small business member. Where it requires some level of past performance and/or experience of the protégé or lead small business firm, the procuring activity shall not require that firm to individually meet all the same evaluation or responsibility criteria as that required of other offerors generally.

13 C.F.R. § 125.8(e)(1) (Jan. 16, 2025) (emphasis added). The amendment postdates the October 10, 2024 proposal submission deadline and ensuing initial SSEB evaluation but predates the SSEB's post-discussions evaluation of final proposals, the SSEB's May 6, 2025 final recommendation, and the SSA's May 20, 2025 BOSC award.

The parties disagree as to the revision's import. Chugach and CCS KG both characterize the regulatory revision as immaterial, although for different reasons: Chugach contends that both versions would require the Navy to consider a protégé's experience; CCS KG responds that neither version required the Navy to do so. Only

the government characterizes the amendment as "material to [Chugach's] argument here." ECF 35 at 29–30 (first citing 13 C.F.R. § 125.8(e)(1) (Jan. 16, 2025); and then citing 89 Fed. Reg. 102448, 102462 (Dec. 17, 2024)). As highlighted by the government, in finalizing the amendment to § 125.8, the SBA published the following notice and commentary:

> Section 125.8(e) covers how agencies evaluate the capabilities, past performance, and experience of joint ventures, including SBA mentor-protégé joint ventures. For SBA mentor-protégé joint ventures, section 125.8(e) provides that a procuring activity may not require the protégé firm to individually meet the same evaluation or responsibility criteria as that required of other offerors generally. This provision recognizes that protégés may be less experienced when submitting an offer but, if they win the award, will gain experience and capabilities while performing with the mentor. SBA does not require, however, that every contract competition include special evaluation criteria for protégés.
>
> A recent decision by the Court of Federal Claims has caused some confusion as to what past performance a procuring activity can require of a protégé joint venture partner and how that past performance should be evaluated. *See SH Synergy, LLC v. United States*, 165 Fed. Cl. 745 (2023).
>
> . . .
>
> *[T]he final rule clarifies that a procuring activity contracting officer may rely solely on the past performance and experience of the mentor joint venture partner in its discretion.*

89 Fed. Reg. at 102462 (emphasis added). At oral argument, however, the government aligned its position with CCS KG's. In any case, the Court must reject Chugach's argument as untimely.

Chugach's argument implicates several analytically distinct questions: (1) what § 125.8(e) required the Navy to do at the time the solicitation was issued and proposals were submitted, (2) whether the January 16, 2025 amendment to § 125.8(e) materially changed the regulation or merely clarified it, (3) whether the timing of the solicitation, evaluation, and award—which straddled the amendment—required the agency to modify its evaluative approach and award decision, and (4) whether Chugach may raise these issues for the first time in a post-award bid protest. The last issue is dispositive.

Chugach's § 125.8(e)-centric arguments entail a patent defect in the solicitation, which must be challenged before the close of bidding to avoid waiving the claim. *See Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1315 (Fed. Cir. 2007) ("[A] party who has the opportunity to object to the terms of a government

solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection afterwards in a § 1491(b) action in the Court of Federal Claims."), *quoted in Bannum, Inc. v. United States*, 779 F.3d 1376, 1380 (Fed. Cir. 2015) ("A bidder that challenges the terms of a solicitation in the Court of Federal Claims generally must demonstrate that it objected to those terms 'prior to the close of the bidding process.' If it cannot do so, the bidder 'waives its ability to raise the same objection afterwards in a § 1491(b) action.'"). The invocation and interpretation of § 125.8 as requiring the Navy to consider the experience of both King & George and Cascade notwithstanding CCS KG's status as an SBA-approved MPJV simply cannot be reconciled with the solicitation's express language. Under Corporate Experience (Factor 1), the solicitation explicitly exempted MPJVs from the requirement that each member of a joint venture demonstrate qualifying past experience:

> *With the exception of offerors covered by Mentor-Protégé Agreements approved by the [SBA]*, if the offeror is a Joint Venture (JV), each member of the JV must demonstrate prime contractor experience on at least one relevant project. If each member of the [JV] does not have at least one relevant experience project, then the offeror will be assigned a deficiency and will be rated Unacceptable.

AR 258 (emphasis altered).

Chugach attempts to resist this conclusion by arguing that the solicitation is not inconsistent with § 125.8 because the solicitation is directed at offerors, whereas the regulation governs the Navy's internal evaluation process. The Court is unpersuaded. The language at issue—which exempts MPJVs from the requirement to demonstrate each member's experience—does not fall under the "Solicitation Submittal Requirements" subheading of Corporate Experience (Factor 1), but under the "Basis of Evaluation" subheading. *See* AR 256–58. So, insofar as § 125.8 is directed to the Navy, the same can be said of the applicable solicitation language. Moreover, had the Navy penalized CCS KG for its protégé member's lack of experience, the evaluators would risk subjecting themselves to a non-frivolous charge of applying unstated evaluation criteria. *See Banknote Corp. of Am. v. United States*, 56 Fed. Cl. 377, 387 (2003) (finding that unstated evaluation criterion exists where "the procuring agency used a significantly different basis in evaluating the proposals than was disclosed"), *aff'd*, 365 F.3d at 1345, *quoted in AccelGov, LLC v. United States*, 163 Fed. Cl. 43, 50 (2022); *Frawner Corp. v. United States*, 161 Fed. Cl. 420, 446 (2022) (holding that "'unstated evaluation criteria' that fails to put bidders on notice of how they would be evaluated" and "directly conflicts with the Solicitation" provides a basis for finding the evaluation arbitrary and capricious (quoting *Banknote*, 56 Fed. Cl. at 386)).

In short, when the language of a solicitation is internally inconsistent or conflicts with a statute or regulation—whether addressing a criterion or qualification

or noticing the evaluation of that criterion or qualification—the inconsistency is a defect in the solicitation. Where that inconsistency is apparent from the face of the solicitation, it is patent and must be challenged pre-award. *See Accura Eng'g & Consulting Servs., Inc. v. United States*, 167 Fed. Cl. 258, 271 n.7 (2023) ("Offerors are required to raise patent defects in solicitations—that is, aspects of a solicitation that are obviously inconsistent with law—during the procurement in order to preserve objections." (first citing *Bannum*, 779 F.3d at 1380; then citing *Land Shark Shredding, LLC v. United States*, 842 F. App'x 589, 593 (Fed. Cir. 2021); and then citing *Burney v. United States*, 499 F. App'x 32, 34 (Fed. Cir. 2012))). Chugach failed to timely raise—and thus waived—this issue.

III. Past Performance

Chugach next argues the Navy acted arbitrarily in assigning CCS KG a substantial confidence rating for Past Performance (Factor 2) without considering King & George's October 17, 2023 CPARS assessment, wherein King & George received a marginal rating for quality on a custodial services contract at Naval Base Coronado. According to Chugach, this information was highly relevant to the BOSC procurement and too close at hand for the Navy to ignore. The Court agrees.

The government and CCS KG principally maintain that the Navy had no obligation to consider the October 17, 2023 CPARS because the underlying contract did not satisfy the BOSC solicitation's definition of "relevant project" included under Corporate Experience (Factor 1): namely, the $10 million annual threshold and the minimum of two specified service areas.[27] But this argument relies on the flawed premise that the relevancy standard included in Corporate Experience (Factor 1) limited the scope of projects the Navy could consider under Past Performance (Factor 2). Rather than adopt the limited "relevant project" definition articulated in the Corporate Experience (Factor 1) section of the solicitation, *see* AR 256–57, the Past Performance (Factor 2) section included the following expansive parameters:

> <u>Past Performance on All CPARS Evaluations for Services</u>
>
> *The Government may review all CPARS evaluations for Offerors, for projects other than those submitted under Factor 1*, with specific focus on quality, schedule and management. CPARS evaluations that contain ratings for marginal to unsatisfactory for quality, schedule, and/or management may lower the overall confidence assessment rating. . . .

---

[27] In its briefs, the government further states that "if the Navy had considered the predecessor contract, it arguably would have been applying an unstated evaluation criteria [sic] by doing so." ECF 35 at 34; *accord* ECF 42 at 10 (arguing that any information not meeting Factor 1's relevancy criteria "could not be utilized" by the agency). At oral argument, however, the government conceded that the agency did have discretion to consider the CPARS for the King & George predecessor contract and argued that the agency's omission to do so was not abuse of discretion.

> In addition to the above, the Government reserves the right to obtain information for use in the evaluation of past performance from any and all sources including sources outside of the Government. Other sources may include, but are not limited to, past performance information retrieved through CPARS using all CAGE/UEI numbers of the Offeror's Team, inquiries of owner representative(s), Federal Awardee Performance and Integrity Information System (FAPIIS), Electronic Subcontract Reporting System (eSRS), and any other known sources not provided by the Offeror.

AR 260–61 (only italics added). The juxtaposition between Factor 1's limited relevancy standard and Factor 2's broad discretion is telling.

A procuring agency's discretion in conducting past performance evaluations is cabined by the too close at hand doctrine. This doctrine imposes an affirmative duty on the agency to consider readily available and relevant past performance information in its possession when the agency has discretion to do so. *Coastal Env't Grp., Inc. v. United States*, No. 22-868, 2023 WL 1794581, at *14 (Fed. Cl. Jan. 19, 2023) (citation omitted). As further explained by this Court:

> It is well-established that some information is simply "too close at hand" to require offerors to shoulder the inequities that spring from an agency's failure to obtain, and consider, the information. Regarding past performance evaluations, moreover, agencies are not restricted to references submitted by offerors and must draw upon internal information, even if not cited by the offeror. Nevertheless, courts typically limit the universe of information that it considers "too close at hand" to documents in the possession of the contracting agency or information that is personally known to the contract evaluator.

*KACE Co., LLC v. United States*, 167 Fed. Cl. 192, 208 (2023) (cleaned up); *accord ProSecure, LLC v. United States*, 151 Fed. Cl. 697, 707 (2020) ("This Court has held that the 'too close at hand' doctrine requires that, if a government agency possesses personal knowledge or internal information pertaining to an offeror's contract or prior work, the agency may be obligated to consider that information even if the offeror did not cite the information in a proposal." (citing *Vanguard Recovery Assistance v. United States*, 101 Fed. Cl. 765, 781 (2011))).

A procuring agency errs under the too close at hand doctrine when: (1) the agency failed to consider information that it had discretion to consider, (2) the information was sufficiently relevant to the procurement, (3) the information was close at hand, and (4) the Court cannot discern from the record a contemporaneous rational basis for the agency's failure to consider the information. At the first step, the Court determines whether the agency had discretion to consider the information. As explained above, in the solicitation at issue here, the second prong of Factor 2,

titled "Past Performance on All CPARS Evaluations for Services," unambiguously reserved discretion to review "all CPARS evaluations for Offerors, for projects other than those submitted under Factor 1 . . . ." AR 260–61. There is no indication that the universe of projects the agency could review was limited to those considered relevant under Factor 1's relevancy definition. On the contrary, the phrases "all CPARS" and "other than those submitted under Factor 1" suggest the Navy intended to reserve broad discretion to review information that exceeded Factor 1's relevancy definition.[28]

The second inquiry is whether the information at issue was sufficiently relevant to the challenged procurement. This relevancy inquiry does not ask whether the information satisfied any relevancy requirements included in the solicitation but whether the information was sufficiently pertinent to the procurement such that the agency might have acted irrationally in failing to consider it under the APA standard.[29] *See State Farm*, 463 U.S. at 43 (holding that an agency decision does not pass muster under the APA if the agency "entirely failed to consider an important aspect of the problem"); *see also Ala. Aircraft Indus.*, 586 F.3d at 1375 (Fed. Cir. 2009) (applying this standard in the bid-protest context). To frame this analysis around a relevancy definition from the solicitation—a creation of the agency—rather than the APA standard would undermine the very purpose of the too close at hand doctrine: to "cabin agency discretion." *See Tellus Strategies, LLC v. United States*, __ Fed. Cl. __, Nos. 25-2186 & 26-93, 2026 WL 1737523, *23 (May 29, 2026) ("[T]he too close at hand doctrine exists to cabin agency discretion under solicitations . . . where the agency has some choice in what it reviews when evaluating past performance. . . . [T]he . . . doctrine ensures that an agency does not abuse [its] broad discretion by ignoring highly relevant information." (citing *Insight Pub. Sector, Inc. v. United States*, 157 Fed. Cl. 398, 411 (2021))); *see, e.g.*, *Seattle Sec. Servs., Inc. v. United States*, 45 Fed. Cl. 560, 567–69 (2000) (finding a contracting officer's personal knowledge of incumbent contractor's prior performance on predecessor contract "was simply too relevant and close at hand to ignore").

The past performance information at issue here was sufficiently relevant for the too close at hand doctrine to apply. King & George's previous janitorial services

[28] CCS KG's reliance on *Fluor Fed. Servs., Inc. v. United States*, 169 Fed. Cl. 70 (2023), is misplaced. There, the Court found the too close at hand doctrine inapplicable because the agency had no discretion to consider the information. *Id.* at 80 (noting that "[t]he Solicitation provided a recency threshold for evaluating offerors' Past Performance" and concluding that "any consideration of past performance information by the Agency outside the stated recency window would . . . amount to an express violation of the stated Solicitation criteria").

[29] The GAO concluded that the Navy did not err in not considering the October 17, 2023 CPARS evaluation for CCS KG. *See Chugach Logistics & Facility Servs. JV, LLC*, B-423690 et al., 2025 WL 3296808, at *10–11 (Comp. Gen. Nov. 20, 2025). In reaching this conclusion, as discussed herein, the GAO improvidently imported the limited definition of "relevant project" included in Corporate Experience (Factor 1) submission requirements into the Past Performance (Factor 2) evaluation requirements. *See id.*

contract involved much the same work as the instant procurement and was performed at the same naval base. In fact, custodial services is the largest component of the BOSC procurement, accounting for nearly half of the annual contract value. In the CPARS at issue, the Navy assigned King & George a marginal quality rating, meaning that King & George's "[p]erformance d[id] not meet some contractual requirements [and] [t]he element being assessed reflects a serious problem for which the contractor has not yet identified corrective actions." AR 6676. More specifically, the CPARS reported that King & George's cleaning services were not performed on schedule, that "[c]ustodians [we]re not completing the services per the contract[']s Performance standards," and that the "Contractor management team" had "been working with the union to replace" problematic custodians. *Id.* Further, the CPARS predated the BOSC solicitation by just nine months. Such performance issues documented so recently before the instant solicitation were, by any exacting standard, an "important aspect" of CCS KG's past performance. *State Farm*, 463 U.S. at 43. The solicitation criteria for Past Performance (Factor 2) provided that the agency would review CPARS "with specific focus on quality" and that marginal ratings "may lower the overall confidence assessment rating." AR 261. Notwithstanding the NAVFAC assessor's concluding recommendation that she "**would** recommend [King & George] for similar requirements in the future," AR 6473, the marginal rating was no doubt important enough to be relevant to this procurement. This is particularly true where, as here, NAVFAC was relying exclusively on the experience of mentor member King & George's past performance to assess the procuring agency's confidence in CCS KG.

Third, the Court considers whether the prior performance information was, in fact, close at hand to the procuring agency. This is a factual inquiry that requires the reviewing court to determine whether "the agency possesse[d] or ha[d] personal knowledge of th[e] information." *Tellus*, __ Fed. Cl. at __, 2026 WL 1737523, at *22 (citing *ProSecure*, 151 Fed. Cl. at 707). This step can, of course, present close calls. But here, the information was not just close at hand—it was squarely in the Navy's palm. The NAVFAC official who assigned King & George a marginal quality rating for the predecessor contract also served as one of three SSEB members charged with assessing non-price proposals for the BOSC procurement. Suffice to say, this is not a case where the agency would have had to "hunt for . . . information." *See AccelGov, LLC v. United States*, 164 Fed. Cl. 345, 360 (2023), *quoted in Stevens Aerospace & Def. Sys., LLC v. United States*, 181 Fed. Cl. 626, 639 (2026).

Finally, the Court must consider whether the Navy had a rational basis for failing to consider King & George's CPARS. A procuring agency's past performance evaluation "is entitled to considerable deference," and judges should abstain from substituting their own judgment for the agency's technical expertise. *Taahut*, 849 F. App'x at 266 (quoting *Glenn Def. Marine*, 720 F.3d at 910); *see also CW Gov't Travel*, 154 Fed. Cl. at 748 (collecting cases). Here, though, the record contains no contemporaneous explanation for NAVFAC's failure to mention the adverse information in decisional documents, such as the SSEB report, in assigning CCS KG

a substantial confidence rating for Past Performance (Factor 2). The evaluation record does not state, for instance, that the Navy identified the relevant CPARS and found it non-probative of CCS KG's performance record for purposes of the BOSC procurement or that the evaluators were satisfied by the prior assessor's comments (e.g., "performance has improved since the base year of the contract"). *See* AR 6676. That omission is consequential. As this Court has observed: "Where an agency fails to document or retain evaluation materials, it bears the risk that there may not be adequate supporting rationale in the record for [the Court] to conclude that the agency had a reasonable basis for its evaluation conclusions." *Mgmt. & Training Corp.*, 161 Fed. Cl. at 597 (citations omitted). Put simply, the Court cannot defer to an agency's judgment where there is no evidence the agency exercised that judgment in the first place.

Moreover, the question is not whether NAVFAC can articulate a plausible post hoc reason why the agency might properly disregard the negative CPARS. Courts may not accept rationales offered for the first time during litigation as a substitute for the agency's documented reasoning at the time of award. *See Superior Waste Mgmt. LLC v. United States*, 169 Fed. Cl. 239, 278 (2024) ("[A] contracting officer is not permitted to offer a post hoc rationale to validate agency action—and . . . this Court is not permitted to consider such an explanation . . . ."); *DynCorp Int'l*, 10 F.4th at 1316 ("[A]n agency cannot rely on a new rationale for an old decision."); *Vanguard Recovery Assistance v. United States*, 99 Fed. Cl. 81, 102 (2011) ("Post hoc declarations and arguments will be discounted or disregarded."). Ignoring this basic principle, the government relies, inter alia, on the following series of explanations proffered by the NAVFAC contracting officer during the GAO protest: referencing the restrictive definition of "relevant project" included in the Corporate Experience (Factor 1) section of the solicitation, distinguishing the nature and scope of the janitorial services contract previously performed by King & George and the BOSC contract awarded to CCS KG, and speculating that the marginal rating for quality "would not have substantively impacted the evaluation to the extent of lowering CCS KG's overall performance confidence rating and therefore would not have changed the evaluation . . . ."[30] AR 6488. To this list, the government now adds that the Navy's failure to consider CPARS for projects outside the relevancy definition from Corporate Experience (Factor 1) "actually helped [Chugach]," highlighting the SSA's unearthing of "seven derogatory records for [Chugach]'s affiliates" during a May 6, 2025 search of the CPARS database. ECF 35 at 34 (citing AR 6498). Yet the decision reached today does not necessarily implicate the recently discovered derogatory CPARS, as the Court is not deciding that *all* negative performance records that the Navy can locate trigger application of the too close at hand doctrine. The only documents implicated are those sufficiently pertinent to the procurement and

[30] For completeness, the contracting officer further explained: "CCS KG submitted the maximum amount of project[s] (4), received three satisfactory or higher past performance evaluations for relevant projects submitted in Factor 1, and I had a high expectation that CCS KG would successfully perform the required effort[.]" AR 6488.

close at hand. As with King & George's October 17, 2023 CPARS, the Navy must perform the critical assessment in the first instance.

On this record, the Court finds the Navy lacked a rational basis for failing to consider the documented adverse past performance information concerning King & George's prior janitorial service contract at Naval Base Coronado. The Navy had discretion to consider the CPARS, which was both sufficiently relevant to the BOSC procurement and close at hand (i.e., personally known to at least one evaluator). The record betrays no contemporaneous rational basis for the omission.[31]

Chugach has also established prejudice. To prevail, a protester must show a "substantial chance" it would have received the contract award but for the agency's error. *Bannum*, 404 F.3d at 1353 (quoting *Alfa Laval*, 175 F.3d at 1367). That standard is met here. Past performance was a principal discriminator between awardee CCS KG and runner-up Chugach in the Navy's best-value assessment. CCS KG received the highest past performance rating of substantial confidence, while Chugach received the second highest past performance rating of satisfactory confidence. The SSA specifically identified CCS KG's superior past performance assessment as a basis for the best-value determination. The remainder of NAVFAC's evaluation of the two proposals underscores the significance of the past performance discrepancy. For Key Personnel (Factor 3), Chugach received an outstanding rating, whereas CCS KG received only a good rating. And, as detailed above, both offerors' technical ratings were otherwise outstanding across the board. Thus, if CCS KG's Past Performance (Factor 2) advantage was erased or materially weakened, Chugach's proposal would become more competitive by comparison and possibly superior overall for the non-price factors.

The government notes that Chugach proposed a significantly higher price than CCS KG ($107,240,819 versus $82,444,251). But this was a best-value procurement in which the non-price factors, taken together, were "significantly more important than price." AR 271. On this record, the Court cannot conclude that the same award decision likely would have followed had the Navy considered specific adverse past performance information that may have altered the principal non-price discriminator between Chugach and CCS KG. The uncertainty created is sufficient to demonstrate prejudice.

---

[31] The only concurrent record NAVFAC may point to is the CPARS assessing official's ultimate recommendation that, notwithstanding the marginal rating for quality, "[g]iven what I know today about the contractor's ability to perform in accordance with this contract or order's most significant requirements, I **would** recommend [King & George] for similar requirements in the future." AR 6473. But that is, by itself, insufficient. The Navy did not reference the recommendation in its past performance evaluation of CCS KG. Moreover, whether a contractor is recommendable for future efforts despite a marginal quality rating is a substantially different question from whether that same contractor should receive a substantial confidence rating in a future procurement for a larger successor contract. In short, the premise does not beget the inference, let alone the extrapolation.

## IV. Price Risk Assessment

Chugach charges the Navy failed to conduct a price risk assessment, thereby prejudicing Chugach, which submitted a proposal with a higher price than CCS KG. In advancing this argument, Chugach points to the solicitation's incorporation of DFARS provision 252.204-7024 (Notice on the Use of the Supplier Performance Risk System), 48 C.F.R. § 252.204-7024. The government concedes both that the provision was incorporated by reference in the solicitation and that the Navy never conducted a price risk assessment. Yet Chugach overreads § 252.204-7024's mandate and, in any case, fails to identify prejudice from any error on this count.

The plain text of DFARS provision 252.204-7024 requires an agency to use the SPRS in its evaluation of offers. *Id.* § 252.204-7024(c) ("The Contracting Officer will consider SPRS risk assessments during the evaluation of quotations or offers received in response to this solicitation . . . ."). "SPRS retrieves item, price, quality, delivery, and contractor information on contracts from Government reporting systems in order to develop risk assessments." *Id.* § 252.204-7024(b). Where, however, the SPRS does not contain any risk assessments for a given offeror, the agency cannot be faulted for failing to review nonexistent assessments. Such is the case here. During the GAO proceedings, the government produced evidence—which Chugach does not dispute—that no SPRS risk assessments existed for either CCS KG or Chugach. Accordingly, to the extent it was error for the Navy not to contemporaneously search the SPRS, it is harmless.[32]

Chugach attempts to persuade the Court that DFARS provision 252.204-7024 requires an agency to not only use the SPRS in its evaluation, but also to independently conduct a price risk assessment using "all available and relevant information." ECF 31 at 30. In so arguing, Chugach principally points to part (e) of the provision, which states that "[t]he Contracting Officer *may* consider any other available and relevant information when evaluating a quotation or an offer." 48 C.F.R. § 252.204-7024(e) (emphasis added). Read in conjunction with the other parts of the provision, Chugach submits that this requires an agency to conduct an independent price risk assessment if no SPRS data is available. The Court declines to adopt this reading of the text, which bears no relation to the plain language of the provision or its clear purpose: to, where applicable, mandate the use of the SPRS in an agency's evaluation.

## V. Best-Value Tradeoff

Chugach's best-value claim is derivative of its preceding challenges and does not present an independent basis to find prejudicial error. Because the Court

[32] Moreover, 48 C.F.R. § 252.204-7024 pertains only to price risk (i.e., the risk that a proposed price is too *high*). This is consistent with the solicitation's guidance to identify "unreasonably high" prices. *E.g.*, AR 255. In arguing that the DFARS provision and the solicitation required the Navy to analyze whether CCS KG's proposed price was too *low*, Chugach misconstrues both.

sustains Chugach's claim that the Navy's evaluation of CCS KG's Past Performance (Factor 2) lacked a rational basis, the resulting best-value determination must be set aside. To be clear, a procuring agency's best-value tradeoff analysis enjoys significant deference, and the Court will not substitute its own judgment for that of the agency. *First Enter. v. United States*, 61 Fed. Cl. 109, 122 (2004) ("[T]he court must accord broad deference to a contracting officer's decision as to which proposal in a negotiated procurement represents the best value." (collecting cases)). Here, however, the Court has found that the Navy's evaluation of awardee CCS KG's past performance prejudiced second-ranked Chugach. Aside from that flawed past performance assessment, moreover, Chugach's offer received identical or better non-price adjectival ratings. Although Chugach's proposed price was over thirty percent higher than CCS KG's, the solicitation expressly stated: "When the proposal is evaluated as a whole, the technical factors and past performance/performance confidence assessment factor combined (i.e., the non-cost/price evaluation factors) are *significantly more important than price*." AR 271 (emphasis added). Thus, there is a substantial chance that a proper best-value tradeoff analysis would result in a contract award to Chugach.

VI. Injunctive Relief

In certain circumstances, including post-award bid protests, this Court is authorized by statute to "award any relief that the court considers proper, including declaratory and injunctive relief . . . ." 28 U.S.C. § 1491(b)(2). In a bid protest, this Court may issue an injunction to "enjoin[] the illegal action and return[] the contract award process to the status quo ante." *Turner Constr. Co. v. United States*, 645 F.3d 1377, 1388 (Fed. Cir. 2011) (quoting *Parcel 49C Ltd. P'ship v. United States*, 31 F.3d 1147, 1153 (Fed. Cir. 1994)). To grant injunctive relief, the Court must consider whether:

> (1) the plaintiff has succeeded on the merits of the case; (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) the public interest is served by a grant of injunctive relief.

*G4S Secure Integration LLC v. United States*, 161 Fed. Cl. 387, 418 (2022) (quoting *Centech*, 554 F.3d at 1037)). As the party seeking injunctive relief, Chugach bears the burden of proof. *Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982, 999 n.13 (Fed. Cir. 2018).

On this record, each factor favors granting injunctive relief. As discussed above, Chugach succeeds on the merits on at least one procurement challenge. With respect to irreparable harm, the government asserts Chugach cannot carry its burden because it failed to proffer a declaration of claimed harm. But no such declaration is required in every instance. *See Allicent Tech.*, 166 Fed. Cl. at 186. Here, the record

itself makes plain that Chugach will suffer irreparable harm absent injunctive relief. Chugach faces the loss of a multi-year BOSC opportunity—an injury that cannot be remedied through monetary damages alone. Chugach's lost opportunity to compete for and perform on a government contract, together with the attendant loss of revenue, past performance credit, and competitive standing, constitutes irreparable harm. *See Palantir USG, Inc. v. United States*, 129 Fed. Cl. 218, 292–93 (2016) (explaining that prejudicial errors in a procurement constitute "not only irreparable injury in terms of lost potential profit, but also in terms of lost experience and opportunity to work with the [government]"), *aff'd*, 904 F.3d 980 (Fed. Cir. 2018); *Bluewater Mgmt. Grp., LLC v. United States*, 150 Fed. Cl. 588, 619 (2020) (explaining that losing the "experience associated with performing the contract, which has value when competing in future procurements[,]" can constitute irreparable harm).

The balance of hardships also favors Chugach. The hardship to Chugach—the irretrievable loss of a multi-year contract opportunity—is substantial. By contrast, the burden on the government of reevaluating proposals and making a new source selection decision is modest, particularly considering the procurement errors identified. Any administrative delay or cost associated with correcting the Navy's own error does not outweigh the concrete and unrecoverable harm to Chugach. *Cf. Mgmt. & Training Corp.*, 161 Fed. Cl. at 618 ("The costs that the Department of Labor might incur to reprocure the contract—which defendant does not identify or quantify—are the direct result of the agency's failure to conduct a fair competition and are not greater than the harms suffered by MTC due to the lack of a fair competition."). CCS KG, for its part, has not identified any hardships that tip the scales against injunctive relief. That it has "been prevented for many months from beginning performance by the litigious incumbent," ECF 36 at 37, is at least partially attributable to CCS KG's own failure to request expedited briefing during the initial status conference in this matter. And while a reevaluation of the proposals comes with a significant risk of losing the BOSC, CCS KG has no legitimate claim to an erroneously awarded contract.

Finally, the public interest is served by an injunction. There is a strong public interest in maintaining the integrity of the procurement process. *See PGBA, LLC v. United States*, 57 Fed. Cl. 655, 663 (2003) ("[T]he public interest in honest, open, and fair competition in the procurement process is compromised whenever an agency abuses its discretion in evaluating a contractor's bid." (first citing *Cincom Sys., Inc. v. United States*, 37 Fed. Cl. 266, 269 (1997); and then citing *Magellan Corp. v. United States*, 27 Fed. Cl. 446, 448 (1993))). Enjoining performance under an award that rests on a flawed past performance evaluation vindicates that interest, and the government identifies no countervailing public interest—such as an urgent or compelling unmet need for uninterrupted performance—sufficient to outweigh it.[33] Because all four factors favor Chugach, the Court grants permanent injunctive relief.

[33] On the contrary, the provision of services has continued through a series of bridge contracts.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for judgment on the administrative record (ECF 31) is granted-in-part and denied-in-part. Defendant's and defendant-intervenor's cross-motions for judgment on the administrative record (ECF 35, 36) are conversely denied-in-part and granted-in-part. The Navy shall cancel the BOSC awarded to CCS KG and shall not award a new contract under the solicitation at issue unless and until it reevaluates the proposals in accordance with this decision. The Clerk of Court is directed to enter judgment accordingly. Costs to plaintiff.

It is so **ORDERED**.

Armando O. Bonilla
Judge